UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SCOTT FORREST COLLINS,<br><br>      Plaintiff,<br><br>   v.<br><br>RON DAVIS,<br><br>      Defendant. | Case No.17-cv-06976-VKD<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 20 |

In this action, *pro se* plaintiff Scott Forrest Collins, a prisoner confined at San Quentin State Prison ("SQSP"), challenges the prison's policy for conducting unclothed body searches of condemned inmates. Defendant Ron Davis is the SQSP warden. Both parties have consented to magistrate judge jurisdiction. Dkt. Nos. 3, 15.

Mr. Collins asserts the following claims against Mr. Davis in his official and individual capacities: (1) violation of his First Amendment right to free exercise of religion, (2) violation of his right to religious exercise under the Religious Land Use and Institutional Person Act ("RLUIPA"), (3) violation of his Fourth Amendment right against unreasonable searches, (4) violation of his Eighth Amendment right against cruel and unusual punishment, and (5) violation of his Fourteenth Amendment rights to equal protection and due process. Dkt. No. 1 ¶¶ 17-26; Dkt. No. 8 at 2. Mr. Collins seeks an injunction, compensatory damages, and punitive damages. Dkt. No. 1 ¶¶ 27-34.

Mr. Davis moves for summary judgment on the merits as to all asserted claims. In addition, Mr. Davis moves for summary judgment on the basis that the Eleventh Amendment bars Mr. Collins's claims for damages against Mr. Davis in his official capacity, that Mr. Collins's

RLUIPA claim for damages against Mr. Davis in his individual capacity seeks a remedy that is not available under that statute, and that Mr. Collins has not made the requisite showing for injunctive relief under RLUIPA. Finally, Mr. Davis contends that he is entitled to qualified immunity as to Mr. Collins's constitutional claims and that Mr. Collins may not recover punitive damages. Dkt. No. 20. Mr. Collins opposes summary judgment as to all matters. Dkt. No. 21.

For the reasons discussed below, the Court grants Mr. Davis's summary judgment motion.

## I.  BACKGROUND

The following facts are undisputed unless otherwise noted:

### A.  San Quentin State Prison

SQSP is a California state prison that houses convicted prisoners, including those who have been condemned to death. *See* Dkt. No. 20-2 ¶ 4; Dkt. No. 22 ¶ 10. Condemned inmates are housed in four different units: East Block, Donner Section, the Adjustment Center, and North Segregation. Dkt. No. 20-2 ¶ 4; Dkt. No. 22 ¶¶ 10, 12. Most condemned inmates are held in the East Block. Dkt. No. 20-2 at ¶ 4. Donner Section serves as overflow for the East Block. Dkt. No. 22 ¶ 10. The most violent condemned prisoners are held in the Adjustment Center. *Id.* ¶ 12; Dkt. No. 20-2 ¶ 4. North Segregation houses condemned prisoners who have demonstrated particularly good behavior and who do not have enemies among the other prisoners (referred to as "enemy concerns"). Dkt. No. 20-2 ¶ 4.

North Segregation is a more desirable housing unit for condemned prisoners because those housed there have open-tier access and more out-of-cell time.[1] *Id.* ¶ 5. Generally, to be eligible for placement in North Segregation, inmates must be discipline-free for at least five consecutive years and cannot have any enemy concerns.[2] *Id.* Housing capacity in North Segregation is

---

[1] Mr. Collins disputes whether North Segregation prisoners are permitted more out-of-cell time than East Block prisoners. Dkt. No. 22 ¶ 32 ("Captain Avila gives the impression that North Seg. has more privil[e]ges than East Block, this is not accurate, we are all classified as Grade A prisoners, North Seg. prisoners are allowed out of their cells during the same hours that East Block prisoners have exercise yard time.").

[2] Mr. Collins disputes whether condemned prisoners housed in North Segregation have enemy concerns. Dkt. No. 22 ¶ 33 ("North Seg. also has plenty of prisoners with potential enemy concerns, this is not unique to North Seg., East Block, or any prison yard anywhere.")

1    limited, and vacancies typically occur only when an inmate dies or seeks a transfer to another

2    condemned housing unit. *Id.* There is a waitlist for inmates seeking to be housed in North

3    Segregation. *Id.*; *see also* Dkt. No. 22 ¶ 31.

4        SQSP classifies condemned prisoners by security level, which determines the kind of

5    housing and programs to which they can be assigned. Dkt. No. 22 ¶ 13; *see also* Dkt. No. 20-2 ¶

6    10. SQSP also classifies prisoners by "grade" according to security risk and disciplinary issues.

7    Dkt. No. 22 ¶ 9; Dkt. No. 25-6 at 4. Grade A inmates are considered general population inmates,

8    who do not present unusual security risks and have demonstrated a discipline-free adjustment to

9    incarceration. Dkt. No. 20-2 ¶ 6; Dkt. No. 22 ¶ 11. Condemned Grade B inmates are those with

10   disciplinary concerns or enhanced security risks. Dkt. No. 20-2 ¶ 6; Dkt. No. 22 ¶ 12. As a

11   general matter, Grade A prisoners have more privileges and fewer restrictions than Grade B

12   prisoners. *See* Dkt. No. 20-2 ¶ 6. However, their privileges and restrictions may also depend on

13   their housing assignment. *See id.* ¶ 5.

14      **B.**     **Mr. Collins**

15        Mr. Collins is currently housed in the East Block. Dkt. No. 20-2 at ¶¶ 7, 15; Dkt. No. 20-3

16   ¶ 6. Like all condemned prisoners, Mr. Collins is classified as a security level 4 inmate, which

17   qualifies him for maximum security custody. Dkt. No. 20-2 ¶ 10; Dkt. No. 22 ¶ 13. Given this

18   custody level, Mr. Collins must be under direct and constant supervision. Dkt. No. 20-2 ¶ 10; *see*

19   *also* Dkt. No. 20-3 ¶ 10. Mr. Collins is also classified as a Grade A inmate with respect to his

20   security risks and discipline concerns. Dkt. No. 20-2 at ¶¶ 7, 15; Dkt. No. 20-3 ¶ 6.

21        In addition to his security level and grade classification, Mr. Collins's Strategic Offender

22   Management System ("SOMS") file is annotated with the following labels: (1) "DEA," which

23   means that he is serving a death sentence; (2) "VIO," meaning he has a history of violent behavior;

24   and (3) "ARS," meaning he has a history of arson. Dkt. No. 20-2 ¶ 8, Ex. A. The DEA and VIO

25   labels were affixed to his record on December 29, 2014, and the ARS label was affixed on March

26   20, 1991. *Id.*

27        Mr. Collins's SOMS record indicates that he has six non-confidential enemies, all of whom

28   are condemned prisoners at SQSP. Dkt. No. 20-2 at ¶ 9, Ex. B. Mr. Collins must be kept away

from these prisoners at all times. *Id.* ¶ 9. In addition, according to Mr. Davis, Mr. Collins's SOMS record indicates that he has seven confidential enemies from whom he also must be isolated at all times. *Id.* Mr. Davis does not identify the seven prisoners who are confidential enemies of Mr. Collins.

Mr. Collins disputes that he has any enemies at all, but he provides specific evidence as to only one of them, Randy Garcia. Dkt. No. 22 ¶ 30. Mr. Garcia is one of the six prisoners identified as non-confidential enemies in Mr. Collins's SOMS file. Dkt. No. 20-2 at ¶ 9, Ex. B. Mr. Garcia submitted a declaration in support of Mr. Collins's summary judgment opposition testifying that he has known Mr. Collins for over 20 years, that they have always been on good terms, and that the two of them have never been enemies. Dkt. No. 23 ¶ 5, 9. According to Mr. Garcia, over 15 years ago, he and other individuals listed as Mr. Collins's non-confidential enemies were erroneously accused of assaulting Mr. Collins, and that following an investigation, all charges were dropped. *Id.* ¶ 4. Mr. Collins asserts that he has not received any serious rules violations reports for violence or contraband for over 20 years. Dkt. No. 20-2 ¶ 13, Ex. C at 1. Prison records indicate that he has been discipline-free since 2003. Dkt. No. 22 ¶ 34.

On January 3, 2018, Mr. Collins's case came before the Unit Classification Committee ("UCC") for a review and possible adjustment of his security level assessment and his classification. Dkt. No. 20-2 ¶¶ 10, 11. That review considered 42 review periods from December 1996 (when Mr. Collins first arrived at SQSP) to December 25, 2017. *Id.*, Ex. C. at 1. The UCC noted that Mr. Collins had a mandatory minimum placement score of 60 based on his "condemned" status and had remained discipline-free since 2003. *Id.* However, the UCC also noted Mr. Collins alleged gang associations dating back to the 1990s. *Id.*, Ex. C at 1–4. The UCC considered a probation officer's report dated December 17, 1996 indicating that Mr. Collins is a non-validated associate of the Mexican Mafia. *Id.*, Ex. C at 1. The UCC also considered a CDCR-1030 Form dated December 21, 1999, noting that Mr. Collins is likely to be murdered by affiliates of the Mexican Mafia prison gang for misrepresenting himself as the liaison and representative of the Mexican Mafia in the Adjustment Center housing unit. *Id.*, Ex. C at 1, 4. The UCC also noted a CDCR-128-G Form dated March 21, 2002, which states that Mr. Collins

4

was the victim of a stabbing assault on the yard in which he sustained 28 puncture wounds. *Id.*

Other information in Mr. Collins's inmate central file indicates that he is also a non-validated

member of the Barrio Watts street gang,[3] as well as an association of the Aryan Brotherhood. *Id.*,

Ex. C at 44. Based on its review of his file, case factors, and input from committee members, the

UCC decided to retain Mr. Collins's current Grade A classification status. *Id.* ¶ 11. The UCC

also denied him East Block worker-status due to safety concerns. *Id.* In November 2015, Mr.

Collins was referred for consideration for placement on the North Segregation waitlist, as he had

been discipline-free since 2003 and had no in-custody predatory behavior. *Id.* ¶ 14; *see also* Dkt.

No. 25-10 at 1. However, given his gang history and the risks to his own safety described above,

the UCC decided not to place him in North Segregation. Dkt. No. 20-2 ¶ 14.

Mr. Collins denies that he has any recent or relevant gang associations. Dkt. No. 22 ¶ 29

("With respect to gang association, I have tried to avoid gangs and what passes for prison politics

for nearly 20 years."); *see also* Dkt. No. 22 ¶ 31; Dkt. No. 25-10 at 1 ("I have no enemy concerns

here. All my 1030s stem from one individual and my program has been messed up ever since.").

Mr. Collins denies that he was stabbed in the prison yard in 2002. *Id.* Mr. Collins asserts that no

security concerns justify the denial of his request to be placed in North Segregation or at least on

its waiting list because he has no enemies housed there. Dkt. No. 22 ¶ 31.

### C. SQSP's Operating Procedures Manual

SQSP's Operational Procedure 608, also known as the Condemned Manual ("the SQSP

Manual"), sets forth criteria and standards that govern the operation of the Specialized Housing

Division, which is responsible for the day-to-day programming of all condemned male inmates

housed at SQSP. Dkt. No. 20-2 ¶¶ 15, 18, Ex. D at 1. The Correctional Captain and Associate

Warden assigned to the Specialized Housing Division review the SQSP Manual annually, and any

changes are submitted for approval to Mr. Davis in his role as the Warden. *Id.* ¶ 17, Ex. D at 1;

---

[3] The UCC also states that a 128-G form notes that at the time of his arrest on January 24, 1992, Mr. Collins stated that he was once affiliated with the Watts Barrio Grape Street Gang, but that he had not been associated with them since 1984. *Id.* at 4. It is unclear whether the Barrio Watts street gang Mr. Collins's probation officer referenced is the same as the Watts Barrio Grape Street Gang.

Dkt. No. 20-3 ¶ 8.

Sections 422 and 4115 of the SQSP Manual state the circumstances in which prisoners must undergo unclothed body searches, or strip searches, at SQSP. Dkt. No. 20-2 ¶ 16, Ex. D at 11, 22–24. The specific procedures for conducting an unclothed body search in California state prisons is described in the California Department of Corrections and Rehabilitation Operations Manual as follows:

> The inmate subject to the search shall disrobe completely, and staff shall inspect and search each item of clothing and visually inspect the inmate's body. The inmate shall face the staff member who shall visually inspect the inmate's hair, ears, mouth, nose, body, armpits, hands, scrotum, genitals, and legs. The inmate shall turn away from staff upon instruction and staff shall then inspect the inmate's back, buttocks, thighs, toes, bottom of the feet, and lastly, the anal area by having the inmate bend over, spread the cheeks of their buttocks, and cough. Unclothed body searches of inmates by staff of the opposite biological sex shall only be conducted in emergency situations.

Dkt. No. 22 ¶ 19; Dkt. No. 25-3 § 52050.16; *see also* Dkt. No. 20-2 ¶¶ 24-25.

For Grade A prisoners like Mr. Collins, Section 422 of the SQSP Manual provides:

> Upon a Condemned Grade A inmate entering a condemned housing unit, the Condemned Grade A inmate will be immediately placed in a holding cell and given an unclothed body search, unless the Condemned Grade A inmate is returned to the condemned housing unit after being escorted under direct supervision and control of custody staff during the entire time the Condemned Grade A inmate is outside of the condemned housing unit, i.e., escort to the Central Health Services Building (CHSB) for a medical appointment. All inmates will be given an unclothed body search prior to leaving their cell at any time. If a Condemned Grade A inmate has been under supervision and control of custody staff during the entire escort, then the Condemned Grade A inmate will be returned to his assigned cell without an unclothed body search.

Dkt. No. 20-2 ¶ 19, Ex. D at 11. Section 4115 of the SQSP Manual details yard release procedures. Dkt. No. 20-2 ¶ 20, Ex. D at 22. All prisoners housed in the East Block, such as Mr. Collins, are required to undergo unclothed body searches in their cells before they may exit the housing unit and go to the yard. *Id.* Officers must also search the prisoners' clothing. *Id.* According to the SQSP Manual, a prisoner will not undergo an unclothed body search upon returning to his cell if he has been "escorted under direct supervision and control of custody staff during the entire time" he has been outside his cell. *Id.*

According to Mr. Davis, SQSP conducts frequent and routine unclothed body searches of condemned prisoners housed in the East Block because those prisoners housed there generally present an increased risk to the safety and security of the institution, staff, and other prisoners due to the nature of their crimes, enemy concerns, and in-custody behavior. *Id.* ¶ 22. Mr. Davis acknowledges that unclothed body searches are always performed before East Block prisoners are permitted to exit their cells for any purpose. *Id.* ¶¶ 22, 24, 27. When searches are conducted in an inmate's cell, the officer stands in the four-foot wide cell opening to obstruct the line of sight into the cell. *Id.* ¶ 24. When the searches are conducted in holding cells, officers are trained to stand around the inmates as they disrobe to preserve their privacy. *Id.* The unclothed body searches do not involve any touching. *Id.* The inmates' clothes are also inspected with an X-ray machine known as a Rapiscan. *Id.*

Mr. Collins states that since September 2016, he has been subjected to approximately 1,000 strip searches while housed in the East Block. Dkt. No. 22 ¶ 25. He states that he has missed religious services, showers, and exercise yard time "so as not to have to undergo strip searches." *Id.* In March 2017, Mr. Collins filed a grievance concerning the SQSP strip search policy. Dkt. No. 22 ¶ 26; Dkt. No. 25-9 at 1; Dkt. No. 20-3 ¶ 11. That grievance was denied at three levels of review, including by Mr. Davis at the second level. Dkt. No. 22 ¶ 26; Dkt. No. 25-9 at 2, 5–6; Dkt. No. 20-3 ¶ 11. Having exhausted his administrative remedies, Mr. Collins filed a verified complaint commencing this action on December 6, 2017. Dkt. No. 1.

## II.     LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the Court of the

basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *S. Calif. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production either (1) by "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, by "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324–25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Anderson*, 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### III.    DISCUSSION

Mr. Collins does not challenge the manner in which SQSP conducts unclothed body searches. Instead, he contends that, given how those searches are conducted, SQSP's policy of subjecting him to such searches every time he leaves his cell violates his constitutional rights and his rights under RLUIPA. In particular, he says that he personally presents no security risks that

justify the use of frequent and routine unclothed body searches. Mr. Collins contends that such searches should only be conducted on an "unannounced, random basis" and "no more frequently than necessary to control contraband, recover missing or stolen property, or maintain proper security of the prison." Dkt. No. 1 ¶ 29. The Court considers each alleged violation.

### A. First Amendment

Mr. Collins says that the SQSP strip search policy violates his right to the free exercise of his religious practice under the First Amendment. Dkt. No. 1 ¶ 18. Specifically, he claims that being subjected to strip searches every time he leaves his cell deters his attendance at religious services and his participation in his religious practice. *Id.* ¶¶ 10-11. On summary judgment, Mr. Davis does not argue that Mr. Collins has failed to show that the strip search policy burdens a religious practice or belief that is sincerely held. *See* Dkt. No. 20 at 10 (citing *Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008)). Rather, Mr. Davis contends that the policy as applied does not violate the First Amendment because prison safety and security concerns justify routine strip searches of prisoners in East Block. *Id.* at 11–13.

In order to establish a First Amendment violation with respect to the free exercise of religious practice, Mr. Collins must show that the burden the strip search policy imposes on his religious practice is not reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Court must consider the following factors in assessing Mr. Collins's challenge to the reasonableness of the strip search policy: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Id.* at 89–90.

In considering these factors on Mr. Davis's motion for summary judgment, the Court must draw all justifiable inferences in favor of Mr. Collins as to disputed issues of fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006). However, with respect to disputed matters of professional judgment,

the Court's inferences must accord deference to the views of prison authorities. *Id.* at 530. Unless Mr. Collins can point to sufficient evidence showing the policy is not reasonably related to legitimate penological objectives to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. *Id.*

With respect to the first *Turner* factor, Mr. Davis asserts that there is a rational connection between the strip search policy and SQSP's need to maintain prison order and to ensure the safety and security of the prison, staff, and inmates. Dkt. No. 20 at 11; Dkt. No. 20-3 ¶ 13. Mr. Davis relies on the declaration of N. Avila, the Facility Captain of the East Block housing unit at SQSP, for an explanation of the penological objectives SQSP's policy serves. According to Captain Avila:

> It is a common practice for inmates to manufacture pouches that they place close to their groin area to elude officers during a quick pat-down of their outer clothing. The benefit of an unclothed body search is that it enables officers to check for false compartments that might otherwise escape them during clothed searches. Inmates also hide contraband and weapons in their anal cavities, which is why they are required to squat or bend over at the waist and cough.
>
> Unclothed body searches . . . are used by custody staff as an invaluable tool for contraband interdiction in prisons all over the State of California. Unlike unclothed body searches, clothed body searches would not be sufficient to dispel any suspicion that that the inmates might hid contraband on their bodies. Clothed body searches are inconclusive in the sense that only items that protrude from the inmate's clothing would seem apparent to officers during a pat-down procedure, and only metal items can be identified by the handheld metal detector.
>
> . . . If, instead, officers in these specialized housing units were to only perform unclothed body searches on a random basis, as opposed to as a matter of course, the safety and security of the unit, staff, and other inmates would be seriously compromised. This is because officers would have severely reduced control over the items going and coming into the housing unit—drugs, weapons, and other contraband that condemned inmates may receive from others or manufacture themselves.

Dkt. No. 20-2 ¶¶ 25-27. Mr. Davis states that the strip search policy is "longstanding" and is predicated on the security requirements of the particular housing unit and the risks the prisoners within that housing unit pose. Dkt. No. 20-3 ¶¶ 9, 10.

Mr. Collins makes several arguments in response. First, he says that the strip search policy

reflected in the SQSP Manual exceeds the permissible use of unclothed body searches set by state regulation, section 3287 of Title 15 of the California Code of Regulations, and therefore, the policy cannot serve a legitimate penological objective. Dkt. No. 21 at 6–8, 10. Second, he says that the policy does not actually serve the objectives Mr. Davis and Captain Avila say it does because "excessive strip searches may indirectly create greater security risks." *Id.* at 10. Finally, Mr. Collins argues that the policy does not serve any legitimate objective because it is applied "unevenly," given that Mr. Collins's security classification and other risk factors are not unique to him or to the East Block, and others—such as prisoners in North Segregation—are not subject to the same policy. *Id.* at 9, 10.

Mr. Davis has stated a rational connection between SQSP's strip search policy and a legitimate government interest: ensuring the safety and security of the prison, staff, and inmates. *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (prison security is a compelling state interest). The policy principally serves as tool for the detection of contraband that could pose a danger to the prisoners and staff. Mr. Davis offers evidence—which Mr. Collins does not contradict—of the frequency with which contraband is discovered through unclothed body searches and the insufficiencies of other forms of searching.[4]

The state regulation on which Mr. Collins relies does not preclude this policy. Section 3287 permits routine unclothed body searches whenever prisoners move "into or out of high security risk areas." Cal. Code. Regs. tit. 15, § 3287(b). The undisputed evidence reflects that SQSP conducts unclothed body searches when prisoners move from one high security area (e.g., a prison cell) into another (e.g., the showers). On its face, the policy is not inconsistent with the regulation.[5] The Court disagrees that the regulation must be read to prohibit unclothed body searches if a prisoner moves among high security areas within a housing unit, but even if it did

---

[4] The Court appreciates that the routine nature of the unclothed body searches may also serve to deter efforts to conceal contraband in the first place. *See Bell v. Wolfish*, 441 U.S. 557, 559 (1979).

[5] The Court disagrees that section 3287(a)(1), on which Mr. Davis also relies, authorizes routine unclothed body searches within specialized housing units. That subsection concerns only inspections of inmate cells, rooms, dormitory areas, fixtures, lockers, and personal or state-issued property.

preclude such searches on a routine basis, it does not necessarily follow that SQSP's strip search policy has no rational connection to a legitimate penological interest or that it gives rise to a constitutional claim. *See, e.g.*, *Wallace v. Davis*, No. 17-CV-05488-SI, 2019 WL 652889, at *7 (N.D. Cal. Feb. 15, 2019) ("Compliance or non-compliance with state law has no bearing on the analysis of the federal constitutional claims asserted in the complaint.").

Mr. Collins may be correct that "excessive" strip searches undermine a prison's goals of maintaining safety and security, but the question of what is "excessive" is the type of issue on which the Court generally must defer to the professional judgment of prison administrators. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). While there are certainly limits to this deference, Mr. Collins has not raised a triable issue of fact that the circumstances of which he complains exceed those limits. Despite his commendable disciplinary record while incarcerated, Mr. Collins is a maximum security prisoner serving a death sentence for a violent crime, and as a result, he must be kept under direct and constant supervision. In addition, Mr. Collins does not dispute that he has at least some enemies from whom he must be separated at all times; he contradicts Mr. Davis's evidence as to only one purported enemy. Mr. Collins is housed in a specialized housing unit that must manage safety and security concerns relating to a population of prisoners that includes not only Mr. Collins but also other condemned prisoners with similar or even greater security concerns. The strip search policy is at least rationally connected to this legitimate objective.

Mr. Collins cites no evidence that the strip search policy is applied "unevenly" with respect to prisoners within East Block. To the contrary, he objects to the routine use of unclothed body searches with respect to prisoners who, like him, reside in East Block but do not have a record of disciplinary violations. To the extent Mr. Collins contends that he is more like prisoners housed in North Segregation and should be subjected to unclothed body searches on the same basis as they are, that argument fundamentally depends on challenges to Mr. Collins's classification and housing assignment that are not before the Court.

With respect to the second *Turner* factor, the constitutional right at issue is the First Amendment right to the free exercise of his religious practice. Mr. Collins argues that he cannot

attend religious services outside of his cell without subjecting himself to an unclothed body search, and that such searches deter him from engaging in religious services. As Mr. Davis observes, Mr. Collins does not explain the nature of his religious practice or identify which religious services he has been deterred from attending. Mr. Collins does not respond to these arguments, except to say that "*Turner'*s second factor does not apply." Dkt. No. 21 at 10.

The record contains no evidence that SQSP discriminates against Mr. Collins on the basis of his particular religious practice or that his religious practice is such that the strip search policy is itself abhorrent to his religious beliefs. Mr. Collins has shown only that the strip search policy indirectly interferes with his religious practice because he wishes to avoid being stripped searched as a condition of exiting his cell to attend services. This is a relatively weak showing.

With respect to the third *Turner* factor, the Court considers the impact accommodation of Mr. Collins's free exercise right will have on guards and other inmates and on the allocation of prison resources. Mr. Collins appears to argue that all of the constitutional and statutory rights he asserts in this case (including his First Amendment right) may be accommodated by eliminating the use of routine unclothed body searches in favor of less frequent, unannounced searches conducted on a random basis in the East Block. Dkt. No. 21 at 10–11. He notes that conducting searches on an unannounced, random basis is consistent with the guidance provided in state prison regulations regarding the conduct of unclothed body searches, and that less frequent searches will save time and expense for the prison. Mr. Davis responds that if the prison is not permitted to conduct unclothed body searches every time a prisoner enters or exits his cell, the security of the prison will be compromised. Mr. Davis does not specifically address the impact of Mr. Collins's proposed accommodation, which would require the prison to rely on unannounced, random searches to discover contraband.

While Mr. Collins may be correct that less frequent searches could result in short term savings with respect to prison resources, he does not address Mr. Davis's evidence that routine searches are critical to maintaining prison security. Although Mr. Collins contends that there have been no murders committed by condemned inmates within SQSP during the past 20 years, *see* Dkt. No. 22 ¶ 39, he does not dispute Mr. Davis's evidence that unclothed body searches permit

prison staff to search for contraband that might otherwise be concealed from other modes of searching, such as metal detection, clothes scanning, or clothed body searches, and that SQSP's security concerns extend beyond simply preventing murders. In short, Mr. Collins does not point to evidence that the cost savings he envisions would justify the heightened security risk that elimination of routine, unclothed body searches would pose. In addition, Mr. Collins does not show that the substantial deference owed to the professional judgment of prison administrators in weighing the costs and benefits of routine searches compared to random searches could be overcome by contrary evidence in this case.

Finally, with respect to the fourth *Turner* factor, the Court considers whether SQSP's strip search policy represents an exaggerated response to the prison's security concerns and whether there are ready alternatives to that policy. *Turner*, 482 U.S. at 90. Here, Mr. Collins has the burden to show that there are "obvious, easy alternatives" to that policy. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 343 (1987).

As an alternative to SQSP's current strip search policy, Mr. Collins advocates that unclothed body searches in East Block should be conducted on an "unannounced, random basis" and "no more frequently than necessary to control contraband, recover missing or stolen property, or maintain proper security of the prison." Dkt. No. 1 ¶ 29. He does not advocate for the elimination of unclothed body searches altogether; rather, he argues that, given the nature of such searches and the frequency with which they are conducted (i.e., on a routine basis), unclothed body searches represent an exaggerated response to security concerns as applied to a prisoner with his security profile. Mr. Davis insists that it is critical to prison security for prison staff to be able to strip search prisoners whenever they leave or return to their cells.

The Court acknowledges the very substantial invasion of privacy that an unclothed body search represents, no matter how professionally and respectfully it is conducted. Such a search is "indisputably a frightening and humiliating invasion, even when conducted with all due courtesy." *Way v. Cty. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also Kirkpatrick v. City of Los Angeles,* 803 F.2d 485, 489–90 (9th Cir. 1986) ("[T]he fact that a strip search is conducted reasonably, without touching and outside the

14

view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched . . . .") (citation omitted); *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1446 (9th Cir. 1989) ("The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute."). The fact that SQSP conducts these searches on a *routine* basis makes the intrusion more serious, rather than less. *Cf.* Dkt. No. 20 at 19 (suggesting that the routine nature of the search makes it less objectionable).

But for the undisputed evidence of Mr. Collins's security profile and housing assignment, the Court would find it difficult to conclude, as a matter of law, that SQSP's security concerns justify the routine and frequent use of unclothed body searches. Critically, the SQSP strip search policy does not authorize unclothed body searches in those circumstances where a prisoner has had no opportunity to conceal contraband outside his cell—i.e., where the prisoner has been escorted under direct supervision and control of prison staff during such time. *See* Dkt. No. 20-2 ¶ 19, Ex. D at 11. Given Mr. Collins's security profile, the fact that he is currently housed in East Block, and the security concerns described in Captain Avila's declaration with respect to that housing unit, the Court is not persuaded that the less frequent, non-routine search alternative Mr. Collins advocates is obviously an effective alternative to the existing strip search policy, particularly where the only evidentiary support for this alternative is Mr. Collins's own declaration and a 1982 law review article that does not specifically discuss conditions in SQSP. *See* Dkt. No. 22 ¶ 41; Dkt. No. 25-8. The Court acknowledges Mr. Collins's contention that he has been assigned incorrectly to a housing unit based on concerns about his own safety and security that he believes are inaccurate and unfounded, but the correctness of Mr. Collins's housing assignment and whether that assignment is inconsistent with state law or regulation is not before this Court.

On summary judgment, this Court's task is to determine whether Mr. Collins has shown that he could prevail on the merits of his claim that the strip search policy as applied to him is not reasonably related to legitimate penological objectives, in view of the considerations outlined in *Turner* and in view of the deference that must be accorded the professional judgment of prison administrators. *See Beard*, 548 U.S. at 533. On the record before the Court, Mr. Collins has not

made a sufficient showing to raise a genuine issue of fact for trial, and Mr. Davis is entitled to summary judgment on Mr. Collins's First Amendment claim. *Cf. Way,* 445 F.3d at 1158 (finding county's policy of strip searching all arrestees charged with any controlled substance offense unconstitutional); *Warrior v. Gonzalez,* No. C 08-00677 CRB, 2013 WL 6174788 at *5 (E.D. Cal. Nov. 20, 2013) (denying defendant's motion to dismiss prisoner's claim that mandatory strip search twice per day for thirty nights of Ramadan violated his constitutional rights). The Court grants summary judgment on the First Amendment claim in favor of Mr. Davis.

### B.    RLUIPA

As relevant to this case, RLUIPA provides that the state cannot impose a substantial burden on an institutionalized person's religious exercise unless the state demonstrates that imposition of the burden furthers a compelling government interest and is the least restrictive means of furthering that compelling government interest. 42 U.S.C. § 2000cc-1(a). Mr. Collins has the burden to show the SQSP strip search policy imposes a substantial burden on his religious exercise. *Id.* § 2000cc-2(b). If he makes that showing, the burden shifts to Mr. Davis to show that the burden furthers a compelling government interest and is the least restrictive means of furthering that interest. *Id.* Mr. Davis's burden here is much higher than it is with respect to Mr. Collins's First Amendment claim under *Turner*, which requires only that Mr. Davis show that the policy is reasonably related to legitimate penological interests.

The Court considers first whether the strip search policy imposes a substantial burden on Mr. Collins's religious exercise. As explained above, Mr. Collins describes the religious exercise at issue as attendance at religious services.[6] Although he does not explain the nature of those services, the Court will assume for purposes of this motion that they satisfy RLUIPA's broad definition of "religious exercise." *Id.* § 2000cc-5(7)(A). Mr. Collins argues that the SQSP strip search policy burdens his religious exercise because he must subject himself to a search if he wishes to leave his cell to attend services. A policy imposes a "substantial burden" on religious

---

[6] Mr. Collins's opposition does not discuss his RLUIPA claim or Mr. Davis's challenge to it. However, the Court will consider the arguments and evidence offered by Mr. Collins in support of his First Amendment claim in assessing Mr. Davis's summary judgment motion with respect to the RLUIPA claim.

exercise if it is "'oppressive' to a 'significantly great' extent." *Warsoldier v. Woodford*, 418 F.3d

989, 995 (9th Cir. 2005). More specifically, if a policy "puts significant pressure on inmates

. . . to abandon their religious beliefs by [modifying their behavior], it imposes a substantial

burden on [the inmates'] religious practice." *Id.* at 996 (punishing an inmate for refusing to cut his

hair, which would violate his religious beliefs, constituted a substantial burden); *see also Sherbert*

*v. Verner,* 374 U.S. 398, 404–06 (1963) (requiring Seventh-Day Adventist to choose between

working on Saturdays, a day of rest under her faith, and eligibility for unemployment benefits

constituted a substantial burden under the First Amendment). However, a practice that offends a

plaintiff's religious sensibilities but does not force the plaintiff to act contrary to his or her beliefs

is not a "substantial burden." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir.

2008). As explained above, Mr. Collins's complaint and opposition papers do not discuss or

explain the severity of the burden alleged or how they have required him to act contrary to his

religious beliefs. At most, Mr. Collins says that he has "missed religious services . . . so as not to

have to undergo strip searches." Dkt. No. 22 ¶ 25. This showing is insufficient to support Mr.

Collins's claim that the SQSP strip search policy imposes a substantial burden on his religious

exercise. Accordingly, the Court does not reach the remaining elements of the RLUIPA claim.

The Court concludes that Mr. Collins has failed to establish the strip search policy imposes

a substantial burden on his religious exercise under RLUIPA, or to show that there are genuine

issues of material fact on that point. Mr. Davis is entitled to summary judgment on this claim.

### C.     Fourth Amendment

Mr. Collins says that the SQSP strip search policy violates his right to be free from

unreasonable and excessive searches under the Fourth Amendment. Dkt. No. 1 ¶ 19. Specifically,

he claims that being subjected to strip searches every time he leaves or returns to his cell is

unreasonable and excessive, given that he currently is not subject to disciplinary action and has not

received any serious rules violations reports for violence or contraband for over 20 years. *Id.* ¶ 9.

Mr. Davis argues that the policy does not violate the Fourth Amendment because the strip

searches are justified by prison safety and security concerns. Dkt. No. 20 at 16–18.

The Fourth Amendment applies to SQSP's policy and practice regarding unclothed body

searches. *Bull v. San Francisco*, 595 F.3d 964, 974–75 (9th Cir. 2010) (en banc) (prisoners have Fourth Amendment rights with respect to invasion of bodily privacy); *see also Bell*, 441 U.S. at 558 (assuming, without deciding, that strip searches implicate pretrial detainees' Fourth Amendment rights). In order to establish a Fourth Amendment violation, Mr. Collins must show that the burden the strip search policy imposes on his privacy rights is not reasonably related to legitimate penological interests under *Turner*. *See Bull*, 595 F.3d at 973; *Michenfelder v. Sumner,* 860 F.2d 328, 333–34 (9th Cir. 1988). The Court must also consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted as required under *Bell*. *See Bull*, 595 F.3d at 973 ("Although *Bell* continues to provide definitive guidance for analyzing detention-facility strip searches under the Fourth Amendment, *Turner v. Safley* is also relevant to our analysis."); *Thompson v. Souza*, 111 F.3d 694, 699–700 (9th Cir. 1997) (applying *Turner* and *Bell*); *Michenfelder*, 860 F.2d at 332–33 (same). In other words, the Court must "consider the reasonableness of [the intrusion under *Bell*] to help [it] determine if [the intrusion] was reasonably related to legitimate penological interests [under *Turner*]." *Thompson*, 111 F.3d at 700.

The Court first considers the nature of SQSP's strip search policy under *Bell*. Although Mr. Collins challenged the manner and place in which SQSP conducts strip searches in his complaint (*see* Dkt. No. 1 ¶ 15), he appears to abandon that challenge in opposing summary judgment. *See generally* Dkt. No. 21 (no mention of cross-gender or other observation of strip searches). This leaves only the scope of and justification for the strip searches for consideration. As these considerations are also part of the Court's inquiry under *Turner*, the Court will assess them in the context of that analysis.

With respect to the first *Turner* factor, the Court has already found that Mr. Davis has stated a rational connection between SQSP's strip search policy and a legitimate government interest: ensuring the safety and security of the prison, staff, and inmates. *See supra* Section III.A. As explained above, the SQSP Manual requires that a prisoner submit to unclothed body searches every time he leaves his cell and every time he returns to his cells, unless he has been escorted under the direct supervision and control of a prison official during the entire time spent out of his

cell. These searches are conducted on a frequent and routine basis, without any requirement of probable cause or suspicion to believe a prisoner had concealed contraband on his body. The searches are conducted inside the prisoner's cell with a prison guard standing inside the cell doorway to obscure the view. As the searches are limited to those circumstances in which a prisoner may have an opportunity to obtain and conceal contraband, the Court concluded with respect to Mr. Collins's First Amendment challenge that there is a rational connection between the policy and SQSP's interest in ensuring the security of the prison, its staff, and its prisoners. The analysis and conclusion are the same with respect to Mr. Collins's Fourth Amendment challenge. *See Michenfelder,* 860 F.2d at 330, 332–33 (routine strip search policy applied to state's "most dangerous prisoners" served a legitimate penological purpose "so long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell").[7]

With respect to the second *Turner* factor, the constitutional right at issue is the right to be free from unreasonable and excessive searches that invade a prisoner's bodily privacy. Consideration of whether Mr. Collins has alternative means to exercise this right is not particularly meaningful here compared to the First Amendment context, as the right asserted is the inverse of the wrong of which Mr. Collins complains. *See id.* at 331 n.1 ("Not all four factors will be relevant to each case. For example, the second *Turner* factor—availability of other avenues for exercising the right infringed upon—is much more meaningful in the first amendment context than the fourth or eighth, where the right is to be free from a particular wrong.").

With respect to the third and fourth *Turner* factors, the parties make essentially the same arguments as they did with respect to Mr. Collins's First Amendment claim. Mr. Collins contends that routine unclothed body searches are unreasonable and excessive; Mr. Davis contends that such routine searches serve to protect that safety and security of the prison. Mr. Davis adds, however, that two federal appellate decisions, *Michenfelder v. Sumner* and *Campbell v. Miller* have affirmatively "approved of policies that mandate strip searches of high-risk inmates when

---

[7] The Court notes that in *Michenfelder*, the Ninth Circuit affirmed the district court's rejection of a constitutional challenge to Nevada's routine strip search policy for the state's most dangerous prisoners, where the policy required strip searches for prisoners entering their cells even if they had been outside their cells under escort and in chains at all times. *Id.* at 332.

coming and going from certain areas where they interacted with other inmates." Dkt. No. 20 at 17. In *Michenfelder*, the Ninth Circuit affirmed the district court's rejection of a constitutional challenge to an even more onerous strip search policy for Nevada's 40 most dangerous prisoners. 860 F.2d at 331–32. That policy, like the SQSP strip search policy, provided for unclothed body searches whenever a prisoner leaves or returns to his cell. Unlike the SQSP strip search policy, the policy at issue in *Michenfelder* provided for routine strip searches even when a prisoner returns to his cell after having been under escort at all times. In *Campbell*, the Seventh Circuit affirmed the district court's rejection of a constitutional challenge to a federal prison's policy of requiring prisoners to submit to a strip search before and after using the prison law library. 787 F.2d 217, 227–28 (7th Cir. 1986). The challenged policy applied to a unit that housed maximum security level prisoners deemed unfit for the general population because they posed a threat to others or to the orderly operation of the prison.

*Michenfelder* and *Campbell* differ in important respects from this case. In *Michenfelder*, the challenged prison regulations applied only to those prisoners deemed "most dangerous," not merely to all prisoners deemed "high risk," and the policy at issue *Campbell* appears to have applied to condemned prisoners in administrative segregation. Moreover, both *Michenfelder* and *Campbell* were decided after a trial on the merits and therefore benefited from a fully developed record. *Michenfelder*, 860 F.2d at 330; *Campbell*, 787 F.2d at 220–21. Nevertheless, the results in both cases are consistent with the Court's earlier conclusion, discussed above, that the SQSP strip search policy represents an exaggerated response to the prison's security concerns or that the alternative search policy Mr. Collins urges will adequately address those concerns. *See supra* Section III.A.

In view of the deference the Court is required to afford the professional judgment of prison administrators, the Court concludes that Mr. Collins has not made a sufficient showing to raise a genuine issue of fact for trial, and Mr. Davis is entitled to summary judgment on Mr. Collins's Fourth Amendment claim.

### D.     Eighth Amendment

Mr. Collins says that the SQSP strip search policy violates his right to be free from cruel

and unusual punishment under the Eighth Amendment. Dkt. No. 1 ¶ 20. Specifically, he claims that SQSP strip search policy is punitive and not justified by any conduct on Mr. Collins's part or any penological objective. *Id.* ¶ 9. Mr. Davis argues that the policy does not violate the Eighth Amendment because the strip searches are not punitive, but are warranted by prison safety and security concerns. Dkt. No. 20 at 18–19.

In order to establish a violation of the Eighth Amendment, Mr. Collins must show that SQSP's strip search policy (1) deprived him of "the minimal civilized measure of life's necessities" and exposed him to a "substantial risk of serious harm," and (2) was "deliberately indifferent" to his constitutional rights. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). Mr. Collins argues that routine and frequent strip searches are degrading and result in psychological damage. Dkt. No. 21 at 13; Dkt. No. 22 ¶ 24. Mr. Davis argues that the strip search policy was implemented to ensure prison security and to keep prisoners and prison staff safe. Dkt. No. 20 at 19; Dkt. No. 20-3 ¶¶ 12-13.

Unlike the cases on which Mr. Collins principally relies, nothing in the record suggests that the searches to which Mr. Collins is subjected are conducted in a demeaning or sexually abusive manner. *See Somers v. Thurman*, 109 F.3d 614, 623 (9th Cir. 1997) (distinguishing *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993)). The question is whether Mr. Collins's allegations regarding the routine nature of otherwise constitutionally acceptable searches and the frequency with which those searches are conducted support a claim for violation of the Eighth Amendment.

As the Court observed when considering Mr. Collins's First Amendment challenge, an unclothed body search represents a very substantial invasion of privacy that is both frightening and humiliating, and it is hardly less so when a prisoner is subjected to such a search *routinely*. However, Mr. Collins has done little to support his claim that these searches are so harmful as to deprive him of life's necessities or expose him to substantial risk of serious harm. *See supra* Section III.A. But even if he had proffered evidence sufficient to prevail on the merits on that point, Mr. Collins has made no showing whatsoever that Mr. Davis acted with deliberate indifference to his constitutional rights. The record contains no allegation or evidence that Mr.

Davis implemented the SQSP strip search policy with any objective other than to address security and safety concerns within the prison.

As Mr. Collins has not made a sufficient showing to raise a genuine issue of fact for trial with respect to the question Mr. Davis's deliberate indifference, Mr. Davis is entitled to summary judgment on Mr. Collins's Eighth Amendment claim.

### E.     Fourteenth Amendment

Mr. Collins argues that the SQSP strip search policy as applied to him results in the prison treating him differently than similarly situated inmates, thereby violating his right to due process and equal protection of the law under the Fourteenth Amendment.  Dkt. No. 1 ¶ 10.

#### 1.     Equal protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  To establish an equal protection violation, Mr. Collins must show that (1) Mr. Davis treated him differently from similarly situated prisoners; (2) such unequal treatment was not reasonably related to a legitimate penological objective; and (3) such unequal treatment was the result of intentional discrimination by Mr. Davis against Mr. Collins. *See Smith v. Woodford*, No. 04-cv-4793 RMW (PR), 2012 WL 2061535, at *4 (N.D. Cal. Jun. 7, 2012).  In considering Mr. Collins's equal protection challenge, the Court must consider the government's interest in prison safety and security under *Turner.  Washington v. Harper*, 494 U.S. 210, 223–25 (1990).

Mr. Collins argues that other prisoners with the same security level and grade classification are "similarly situated" to him, but they are housed in the North Segregation housing unit where they do not endure routine strip searches.  Dkt. No. 1 ¶ 10.  He says that with the exception of prisoners in administrative segregation, all other California state prisoners are only subjected to unclothed body searches on an unannounced and random basis.  *Id.*  Mr. Davis argues that by virtue of his assignment to East Block, which reflects the prison's current assessment of his security risks and enemy concerns, Mr. Collins is not similarly situated to prisoners housed in

North Segregation. Dkt. No. 20 at 20–21. Mr. Davis also argues that Mr. Collins is not similarly situated to other prisoners in California who are not serving a death sentence and do not share Mr. Collins's security profile and enemy concerns. *Id.* at 21. Mr. Collins does not dispute that he is treated the same as all other prisoners housed in East Block with respect to unclothed body searches. He does not offer any evidence of intentional discrimination by Mr. Davis.

On this record, Mr. Collins has not shown a triable issue of fact regarding his claim that Mr. Davis intentionally discriminated against him with respect to the application of the strip search policy. Moreover, the Court has already concluded that Mr. Davis has shown that the strip search policy is reasonably related to a legitimate penological objective. Accordingly, Mr. Davis is entitled to summary judgment on this equal protection claim.

### 2. Due process

The due process clause of the Fourteenth Amendment protects individuals against governmental deprivations of "life, liberty or property" without due process of law. *Board of Regents v. Roth*, 408 U.S. 564, 570–71 (1972). The due process clause itself does not create a liberty interest in less restrictive conditions of confinement. *See Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005). However, a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations that impose "atypical and significant hardships" on a prisoner "in relation to the ordinary incidents of prison life." *Id.* at 222–23 (quoting *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995) (internal quotation marks omitted).

Mr. Collins asserts two due process violations. First, he says that he should not be subject to routine strip searches unless he has first committed a rules violation and received due process associated with a disciplinary action. Dkt. No. 1 ¶ 11. Second, he contends that denial of his administrative grievance regarding the SQSP strip search policy was a denial of due process. *Id.* ¶ 25.

With respect to the first alleged due process violation, Mr. Collins has not identified any state regulation or policy that gives rise to the liberty interest he claims. As the Court has already explained, section 3287(b) of Title 15 of the California Code of Regulations permits the use of the unclothed body searches at issue here and does not mandate that such searches be used only if a

prisoner is first found to have committed a rules violation.  Mr. Collins has not offered specific facts showing that such searches constitute an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life" in the maximum security housing unit in which Mr. Collins is confined, given the penological objectives Mr. Davis says the searches serve and to which this Court owes deference.  *See Beard*, 548 U.S. at 525.

With respect to the second alleged due process violation, Mr. Collins does not clearly articulate the basis for his allegation that something improper occurred during the processing of his grievance.  It appears from his declaration that Mr. Collins believes Mr. Davis should have recused himself from the second level of review in the grievance process, as Mr. Davis is responsible for authorizing the strip search policy in the first instance.  Dkt. No. 22 ¶ 26.  Mr. Collins also asserts that Mr. Davis falsified evidence, but he neither explains nor supports that assertion with evidence.  *See id*.

Mr. Collins does not have a constitutional right to a particular grievance or appeal procedure.  *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988).  Because as he has not shown that he can establish any basis to challenge the particular grievance procedure in this case, he has not carried his burden on summary judgment.  Accordingly, Mr. Davis is entitled to summary judgment on Mr. Collins's due process claim.

### F.    Qualified Immunity

Mr. Davis contends he is entitled to qualified immunity.  The defense of qualified immunity protects government officials from liability for damages to the extent that their conduct does not violate clearly established constitutional rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether Mr. Davis is entitled to qualified immunity as a matter of law, the Court must decide whether there is a triable issue of fact concerning whether his conduct violated a constitutional right; and if so, whether it would be clear to a reasonable official that his conduct was unlawful in the circumstances he confronted.  *Saucier v. Katz*, 533 U.S. 194, 201–02 (2009).

The Court has concluded that Mr. Collins has not raised a triable issue of fact that any violation of his constitutional rights occurred.  For this reason, Mr. Davis prevails on the first part of the *Saucier* test.  Accordingly, Mr. Davis is entitled to qualified immunity with respect to

damages as a matter of law.

###### G.     Immunity for Claims Seeking Money Damages

Mr. Collins sues Mr. Davis in his individual and official capacities. Dkt. No. 1 ¶ 5. With respect to all of Mr. Collins's claims, Mr. Davis contends that the Eleventh Amendment prohibits litigants from seeking money damages against state officials acting in their official capacity. In addition, with respect to Mr. Collins's claim under RLUIPA, Mr. Davis contends that he may not be sued for money damages in either his official capacity or his individual capacity. Mr. Collins does not respond to these arguments.

Mr. Davis is correct on both points. The Eleventh Amendment bars claims for money damages against state officials acting in their official capacities. *Bair v. Krug*, 853 F.2d 672, 675 (9th Cir. 1988). And RLUIPA does not authorize suits for damages against state officials in either their official capacities or their individual capacities. *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). Mr. Davis is entitled to summary judgment as to these claims for relief.

###### H.     Punitive Damages

Mr. Davis contends that punitive damages are not available in this case. Dkt. No. 20 at 24–25. Mr. Collins does not address this argument.

Mr. Davis is correct that punitive damages are not available with respect to any purported violation of Mr. Collins's constitutional rights absent a showing that Mr. Davis acted with an evil motive or demonstrated reckless indifference to Mr. Collins's constitutional rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). The Court has concluded that Mr. Collins has not shown a triable issue of fact with respect to violations of his constitutional rights. Moreover, Mr. Collins has alleged no facts plausibly suggesting that Mr. Davis acted with an evil intent or a reckless indifference to any such constitutional rights. Accordingly, Mr. Davis is entitled to summary judgment as to these claims for relief.

## IV.     CONCLUSION

For the foregoing reasons, defendant Ron Davis's motion for summary judgment is granted.

///

**IT IS SO ORDERED.**

Dated: September 18, 2019

_____
VIRGINIA K. DEMARCHI
United States Magistrate Judge